IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 21, 2007

## STATE OF TENNESSEE v. ANTONIO DANTE EDMONDSON

**Appeal from the Criminal Court for Davidson County**
**No. 2005-B-876     Cheryl Blackburn, Judge**

---

**No. M2006-00990-CCA-R3-CD - Filed August 20, 2007**

---

The defendant, Antonio Dante Edmondson, was convicted at a jury trial of two counts of facilitation of aggravated robbery, Class C felonies. He received two five-year terms to be served consecutively in the Department of Correction, for an effective sentence of ten years. In this appeal, he claims (1) that the evidence is insufficient to support his convictions, (2) that the trial court erred in admitting proof of other robberies under Tennessee Rule of Evidence 404(b), and (3) that he was improperly sentenced. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and J. C. MCLIN, JJ., joined.

Jennifer Lynn Thompson, Nashville, Tennessee, for the appellant, Antonio Dante Edmondson.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Thomas Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Brandy Goodman testified that she was employed in the loss prevention department of Mapco Express. She said that on January 1, 2005, the Mapco Express store at 5040 Nolensville Road had a video surveillance system installed with five cameras and that none of the cameras were outside the store. She identified a disc containing the surveillance footage for that store on January 1 from 6:00 p.m. until 6:24 p.m.

Jose Sosa testified through an interpreter. He said he was robbed in the Mapco parking lot on Nolensville Road in Davidson County at about 6:00 p.m. on January 1, 2005. He said he was with his wife, Julissa Ponce, and his cousins, Efrian Sosa and Ruben Sanchez. He said he was working on his car. Sosa said he saw a dark green, four-door Cadillac arrive and park two cars away

from his car. He stated that a black man got out of the car, went into the store, returned to the Cadillac, and got into the passenger side. He said the man then approached him and his cousins, all of whom were standing outside his car, pointed a pistol in his face, and demanded money. He said he gave the man $400. Sosa said that the man pointed the gun at the others in his group and that Mr. Sanchez surrendered his wallet, although he did not know the amount of money inside. He said the man told him not to call the police, walked to the Cadillac, got into the passenger side, and left. He said he was not able to see through the tinted windows of the Cadillac well enough to identify the driver. He said that his wife called the police and that he informed the police about the crime through his wife. He said he viewed the Mapco security video on January 1 and saw the man who robbed him on it. He said Efrain Sosa had moved to California.

On cross-examination, Sosa said he was not watching the man closely until he saw him come toward him with a gun. He said he did not pay attention to the driver of the Cadillac.

Julissa Ponce testified that although she could understand some English, she was more comfortable testifying through an interpreter. She said she was sitting inside a truck at Mapco on January 1 when her husband and his cousin were robbed. She said her husband and his cousins were working on the truck when a man approached her husband, stuck a gun in his face, and demanded his wallet. She said that her husband gave the man his money and that the man then demanded and received her husband's cousin's wallet. She said the man backed up while holding the gun and got into the passenger side of his car, which backed up and drove away. She admitted she could not see the driver well enough to identify him, but she said he was a tall man. She said she went into the store after the robbery and told the clerk that the robber was a black man who was wearing a white hat and white sweater.

Detective Robert Russell of the Metro Police Department testified that he and Sergeant Stromatt conducted a taped interview of the defendant on January 28 about the January 1 robbery at Mapco. He said that in that interview, the defendant viewed still photographs from the Mapco surveillance video and identified himself and Michael Johnson in those photographs.

A redacted portion of the defendant's videotaped interview was played for the jury. In the interview, the defendant said he knew the other person in the still photographs only as "Michael." The defendant admitted that he had a green, four-door Cadillac. He said he had a recording studio and that Michael was a customer who came in to record. He said that Michael never had a ride and that on one occasion, Michael asked him for a ride and gave him money for gas. He said that he was taking Michael home and that they stopped at Mapco to get a drink. He said that after he made his purchase, he went to his car with Michael behind him and that Michael robbed some people who were working on a car in the parking lot. He said Michael had a black handgun. He said he asked Michael what he was doing and professed never to have been involved in anything of this nature. He said that he did not want Michael to shoot him and that he drove Michael home after the robbery. He said he did not associate with Michael after this incident, although he also said he had given Michael a ride two or three times after the robbery. The defendant said in the statement that he was

six feet, three inches tall and that Michael associated with someone named "O.J." who was two or three inches taller than the defendant.

Detective Russell said that the defendant maintained in his statement that he had no prior knowledge of a plan for the robbery. He said the defendant said he had received the gas money before the robbery. He said the defendant repeatedly denied having been involved in other robberies.

Detective Rex Davenport of the Metro Police Department testified that he interviewed the defendant on January 28 and that Detectives Jason Rosalia and Chad Gish were present for portions of the interview. He said this interview took place about an hour after the interview conducted by Detective Russell and Sergeant Stromatt. He said the defendant told him he did not know that Michael Johnson was going to rob the people at Mapco on January 1. He said that the defendant initially denied involvement in any other robbery but that he admitted being present for other robberies in December 2004 and receiving proceeds.

Detective Davenport said the defendant admitted his participation with Michael Johnson and Keith Frierson in a robbery at Turtle Creek Apartments about two miles from the Mapco on Nolensville Road. He said the defendant admitted that he drove the other two men to the apartment complex in his green Cadillac and that Johnson robbed a Hispanic man at gunpoint. He said that after this admission, the defendant was not questioned again about the Mapco robbery. He said the defendant reported that he had been the driver in another robbery at an apartment complex near the zoo and at a "mexican club." He said the defendant admitted having been the driver for other robberies in December, "[m]aybe five or six" total. He said the defendant claimed to have received less than $100 total for his participation in the various robberies. He testified that with respect to one of the robberies other than the Mapco robbery, the defendant admitted that he knew what was going to happen.

Detective Davenport said that he learned in the investigation that the defendant had owned his green Cadillac for a short period of time, having purchased it in the middle to latter part of November and having had it for about two months before it was repossessed. He said there was a second green Cadillac owned by a suspect's roommate. He said he learned that the gun used in the robberies was a BB gun. He said the defendant denied having a gun or ever getting out of the car during the robberies.

The defendant testified that he was twenty years old in January 2005. He said that he and his partner, Bobby Shifter, had a recording studio where they recorded hip hop music. He said that although the studio was not open to the public, some people were allowed to pay to record at the studio. He stated that on January 1, Michael Johnson and "his so-called group" of three others came to the studio to record. He said that he knew Johnson from having attended the same school as him in the seventh and eighth grades but that they were not friends. The defendant stated that after Johnson and his friends finished recording, Johnson asked him if he would give Johnson a ride home. He said that he agreed after Johnson gave him $10 for gas. He said that they stopped at a Mapco on the way and that he bought a cigarillo, went to the bathroom, and went to his car. He said

he had forgotten about going to the bathroom when he spoke to the police. He blamed his memory lapse on a stroke he had in the seventh grade. He said that about thirty-five or forty seconds after he got into his car, he saw Johnson committing the robbery. He stated that although he did not deny having been with Johnson on other occasions when robberies took place, he was surprised by Johnson's actions because they had both been in Mapco and would have been recorded by the security cameras. He said that if he had known Johnson was going to commit a robbery, he would have not gone inside Mapco and shown his face, or he would have at least put his hood on or kept his head down. The defendant claimed that Mr. Sosa's testimony was inaccurate when Sosa testified that the robber had come to the car and opened the car door before the robbery. He said that he did not know why he had not driven off and left Johnson and that he wished he had. He said he was mad at Johnson and told him that they would be caught because they would be on tape in the Mapco. The defendant acknowledged having driven Johnson and "Keith" to robberies in mid-December with advance knowledge of what was to take place and said that he got caught in the peer pressure of appearing "hard core." He admitted that he had driven for robberies at Turtle Creek Apartments, a "mexican club," and "Maple Crest." He said there was one occasion, as well, when he allowed Johnson to borrow his car.

The defendant testified that he talked to the police voluntarily when he heard they were looking for him. He said that he denied that he had known Johnson was going to commit a robbery at Mapco and that he had lied about his involvement in the other robberies. He said that when the police implied that they were investigating him for about twenty robberies, he decided to admit those in which he was involved.

The defendant admitted on cross-examination that he did not buy gas at Mapco even though he needed gas. He admitted he parked near the Hispanic victims, rather than at the gas pumps. He said that all of the previous robbery victims had been Hispanic, as well. He denied that there had been any discussion of targeting Hispanics, however.

Stella Thompson testified that she was the defendant's mother. She said that she has known the defendant to be a truthful person. She admitted on cross-examination that the defendant was not living with her in January 2005. She said she was aware that the defendant "was not completely honest" with the police.

After receiving this proof, the jury found the defendant not guilty of the charged offenses of two counts of aggravated robbery of Ruben Sanchez and Jose Sosa. It found him guilty of two counts of facilitation of aggravated robbery.

**I**

The defendant challenges the sufficiency of the convicting evidence. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.

Ct. 2781, 2789 (1979). This means we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The defendant was convicted of two counts of facilitation of aggravated robbery. Aggravated robbery, as relevant to this appeal, is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . ." T.C.A. §§ 39-13-401, -402. "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [Tennessee Code Annotated section] 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403(a).

The defendant argues that the state's proof of the offenses is insufficient because there was no proof the defendant participated in the robbery. Mr. Sosa could not identify the defendant, and did not see whether the defendant's companion got back into the car or talked to the defendant before committing the robbery. Mr. Sanchez did not testify that he saw the companion's gun and that he lost property. In the light most favorable to the state, the evidence reflects that the defendant admitted his presence at the crime scene with Michael Johnson. He admitted that he saw Johnson rob the victims at gunpoint, which was also witnessed by Mr. Sosa and Ms. Ponce. The defendant had been involved in prior robberies in which he was the driver and Johnson was the person who approached the victims, and he had received proceeds of the prior robberies knowing them to be such. The jury had the opportunity to observe the defendant's demeanor when he testified and was within its province in rejecting the credibility of his testimony that he had no knowledge that Johnson was going to rob the victims. Further, the evidence is uncontroverted that the defendant observed Johnson rob the victims but allowed Johnson to get into his car and drove Johnson from the scene. We conclude that the evidence is sufficient to support the defendant's convictions of facilitation of aggravated robbery.

## II

The defendant argues that the trial court erred in admitting evidence of other crimes, wrongs, or acts pursuant to Tennessee Rule of Evidence 404(b). Before trial, the state filed a motion to introduce evidence of the defendant's statements about previous robberies, the defendant's prior knowledge of his co-defendant's intentions, and his receipt of proceeds of those robberies. The state sought to introduce this evidence to show the defendant's intent and prior knowledge of his co-defendant's intent to rob the victims.

Tennessee Rule of Evidence 404(b) prohibits the introduction of evidence of other crimes or acts, except when the evidence of other acts is relevant to a litigated issue, such as identity, intent,

or motive, and its probative value is not outweighed by the danger of unfair prejudice. The rule states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for some other purpose. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). We review a trial court's ruling on evidentiary matters under Rule 404(b) for abuse of discretion, provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). If the court did not substantially comply with the procedure, its decision is not entitled to deference by the appellate court. See id. at 653.

We note, first, that the defendant has failed to include the transcript of the pretrial hearing that was held on the state's motion. The record reflects that the trial court heard the motion on November 21, 2005. Although the technical record contains a written order disposing of the motion, the transcript of that hearing has not been made part of the record. We note that the defendant alleged in his second motion for an extension of time for filing his appellate brief that he had inadvertently failed to request the November 21, 2005 hearing transcript and that "[t]he omission of the transcript of this hearing will significantly prejudice the appellant's chances to prevail on this issue." This court granted the motion for a second extension of time, yet the defendant did not supplement the record with this erroneously excluded transcript. The appealing party has the obligation of preparing a record that includes transcripts of evidence and proceedings "necessary to provide a fair, accurate, and complete account of what transpired" with respect to the issues on appeal. T.R.A.P. 24(b); State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). In the absence of an appropriate record, we must presume that the trial court's determinations are correct. See, e.g., State v. Meeks, 779 S.W.2d 394, 397 (Tenn. Crim. App. 1988).

We note that the trial court found that the video recording of the defendant's statement to the police, which was over two hours long, contained many portions which were unfairly prejudicial or

irrelevant. The court ruled that the tape was inadmissible in its complete form but that certain portions of it might be admissible, subject to determination after receipt of the trial evidence. The court identified those portions in detail by the time shown on the videotapes and the subject matter, and it identified its basis for ruling that each portion might become admissible depending on the trial evidence. After part of the state's proof, the trial court ruled that the portions of the videotapes would be admissible, noting specifically the defendant's cross-examination of Detective Russell about the defendant's denial of involvement in planning, receipt of proceeds, and intent to rob the victims. The court found that the defendant's "knowledge and intent are, clearly, at issue." In response to the trial court's ruling, the defendant moved the court to admit the tapes in their entirety. The defense stated that it maintained its objection to the 404(b) motion but that if some of the tapes were admitted, it preferred that the entirety of both tapes be admitted. After taking the matter under advisement overnight, the trial court ruled that the tapes were "too prejudicial" to be played in their entirety. The court stated that its ruling relied on Tennessee Rule of Evidence 403, not Rule 404(b). It ruled, however, that the defense would be allowed to broaden its inquiry based upon the portions of the tapes which the court had ruled admissible. The defendant then proceeded to present a defense that embraced the prior robberies in detail and posited that the defendant's admission of his involvement in the earlier robberies lent credibility to his denial of prior knowledge and intent on January 1, 2005, for the reason that if the defendant had the requisite knowledge and intent on January 1, he would have admitted it to the police, just as he did with several earlier robberies.

We hold that the trial court did not abuse its discretion in admitting the evidence. The defendant admitted his presence at the crime scene. The central issue was whether the defendant knew his companion was going to rob the victims. During the state's case-in-chief, the defendant attempted to demonstrate by his cross-examination of Detective Russell that the defendant had said in his statement to the police that he did not know of his companion's plan to rob the victims and was an unwitting participant in the crime. When the defendant placed his knowledge and intent at issue, evidence of the defendant's knowing participation in previous crimes with the same companion became highly probative. The trial court complied with the procedural prerequisites for admission of the evidence. The court determined at trial that the probative value of some of the limited evidence outweighed any unfair prejudice to the defendant. The court imposed limitations designed to exclude unfairly prejudicial information from the defendant's statement to the police. The court instructed the jury of the limited purpose for which the evidence could be considered. We hold that the court acted within its discretion in allowing the evidence.

**III**

Finally, the defendant challenges the effective ten-year sentence he received. He claims that he was improperly sentenced to enhanced, five-year sentences and that he should not have received consecutive sentences.

We begin with a review of the evidence presented at the sentencing hearing. The defendant's stepfather, Kendall Thompson, testified that the defendant was living in the home the witness shared with his wife, who was the defendant's mother, and his son. He said the defendant was living with

-7-

his grandmother at the time of the offenses. He said the defendant had a night-shift job, but he also mentioned the defendant having lost a job. He said the defendant had a six-month-old daughter. He said the defendant had a stroke when he was twelve or thirteen, which affected his memory and his ability "to process information verbally." He said the defendant had never been in trouble as a juvenile and had not been in trouble as an adult until "a couple of months span" when the defendant was arrested for driving under the influence and was involved in the robberies. The witness said that he was a school teacher, that the defendant's mother was a retired librarian, and that they would be supportive of the defendant's efforts if he were given a non-incarcerative sentence. The court also received the presentence report and the defendant's pretrial statements to the police as evidence at the sentencing hearing.

When a defendant appeals the length or manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). However, the presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden is on the appealing party to show that the sentence is improper. T.C.A. § 40-35-401(d), Sent'g Comm'n Cmts. This means if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168.

The defendant argues, first, that the trial court erred in imposing sentences which were enhanced above the presumptive minimum sentence based upon the defendant's prior history of criminal activity. See T.C.A. § 40-35-114(2) (2003) (amended 2005).[1] The defendant claims that the trial court violated Blakely v. Washington, 542 U.S. 296 (2004), in enhancing his sentences absent prior convictions or a jury findings of the prior criminal activity relied upon for sentence enhancement.

---

[1]We note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40-35-102(6), -114, -210, -401. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. However, the amended code sections are inapplicable to the defendant's appeal. The defendant was sentenced after the change in the sentencing laws took effect, but the record does not reflect that the defendant signed a waiver of his ex post facto protections to be sentenced under the amended provisions. See T.C.A. § 40-35-210, Compiler's Notes.

We are not inclined to grant the defendant's requested relief. <u>Blakely</u> does, indeed, limit a trial judge's ability to enhance a defendant's sentence. What the defendant overlooks, however, is that <u>Blakely</u>'s limitation encompasses not only facts not found by the jury, but facts not admitted by the defendant, as well. <u>Id.</u> at 303-04; <u>see</u> <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 488 (2000). In the present case, the defendant argues that his "statements to police [regarding the prior robberies] were confused and vague." He neglects to address, however, the fact that he admitted under oath at trial that he had been involved in the December robberies. Based upon the defendant's sworn admissions to prior robberies, we hold that the trial court properly enhanced the defendant's sentences above the presumptive minimum in the range.

The defendant also claims that the trial court erred in imposing consecutive sentences. Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that the defendant is an "offender whose record of criminal activity is extensive" or a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(2), (4). For dangerous offenders, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." <u>State v. Wilkerson</u>, 905 S.W.2d 933, 938 (Tenn. 1995); <u>see</u> <u>State v. Lane</u>, 3 S.W.3d 456, 461 (Tenn. 1999). Rule 32(c)(1) of the Tennessee Rules of Criminal Procedure requires that the trial court "specifically recite the reasons" behind its imposition of a consecutive sentence. <u>See</u> <u>State v. Donnie Thompson</u>, No. M2002-01499-CCA-R3-CD, Maury County, slip op. at 5 (Tenn. Crim. App. Mar. 3, 2003) (reversing the trial court's imposition of consecutive sentencing because it failed to make a finding under Tennessee Code Annotated section 40-35-115(b) and the record did not support a conclusion that the defendant met the consecutive sentencing prerequisites).

In the present case, the court made the following observations on the record with respect to consecutive sentencing:

> Now, let's go to the issue about consecutive or concurrent sentences. I have to follow 40-35-115, which outlines the – the particular reasons that I could give consecutive sentences. There are only two that might apply. And that is that he is an offender whose record of criminal activity is extensive or, four, that he's a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.
>
> Clearly, when you point a gun at – at people, that's a serious offense. Now, just because it's a serious offense does not necessarily mean that you get consecutive sentence[s]. This is a five or six offenses. So it's a pretty extensive criminal history just from this.

And these are all Aggravated Robberies. He might have been convicted of Facilitation, but he was involved in those crimes.

So I'm going to find that the – that the sentences need to run consecutive, that the aggregate term relates to the severity of the offenses. It's necessary to protect the public from further serious conduct from the defendant, though he has – his life up until this point, but these are just very serious offenses. And I can't ignore the – the incredible victim selection in this case. And that is, individuals who are here, maybe, legally or illegally being the victims. I mean, they are just in – and – and it's done for the sole purpose of they won't report the crime or that they won't be here to further any investigation. So – a lot of Hispanic victims don't have bank accounts, have money on them from – because they get paid cash because people don't want to pay them by check. All of these things sort of filter into being a great victim selection, but it's also very dangerous.

Upon review, we hold that the trial court did not err in imposing consecutive sentences. The record reflects that the defendant had admitted his involvement in five or six other armed robberies. The trial evidence supported a conclusion, despite the defendant's protestations to the contrary, that the defendant knew that Michael Johnson targeted Hispanic individuals for armed robberies and had knowingly participated in several robberies as a driver. The defendant could offer no more compelling reason for his involvement in the crimes than peer pressure to appear "hard core." The trial court properly concluded that consecutive sentences were reasonably related to the severity of the offenses and were necessary to protect the public from the defendant.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE